UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MEECO MANUFACTURING CO., INC.,

Plaintiff,

v.

IMPERIAL MANUFACTURING GROUP, et al.,

Defendants.

CASE NO. C03-3061JLR

ORDER

## I.   INTRODUCTION

This matter comes before the court on seven motions from Plaintiff MEECO Manufacturing Company ("MEECO") and Defendants Imperial Manufacturing Group, Imperial Sheet Metal, Ltd., and Normand Caissie (collectively "Imperial").  Imperial has filed two motions for summary judgment (Dkt. ## 146, 154).  Imperial Sheet Metal has also filed a motion for summary judgment (Dkt. # 142).  MEECO has filed two summary judgment motions (Dkt. ## 164, 167), as well as a motion to consolidate this action with an action it recently filed (Dkt. # 163), and a motion for extension of time to respond to one of Imperial's summary judgment motions (Dkt. # 185).  Having read and considered all papers filed in support of and in opposition to these motions, and having heard oral argument from the parties, the court disposes of each motion as explained below.

ORDER – 1

## II.   BACKGROUND

This case comes to the court in the wake of a business courtship gone awry. MEECO manufactures products and accessories for heating stoves, fireplaces, and barbeque grills.  Imperial distributes fireplace and chimney products, although it is a much larger and more diversified entity than MEECO.  In 2000, Imperial president Normand Caissie met MEECO president Clark Schaeffer at a trade show.  They agreed to a distribution arrangement wherein Imperial would purchase MEECO products and resell them to its larger customer base.  They also began a dialogue about a possible acquisition of MEECO by Imperial.  The parties later entered a Confidentiality Agreement protecting information exchanged in negotiating the acquisition.

In 2001, Lowe's Companies, Inc. ("Lowe's"), a nationwide chain of "big box" hardware stores and a MEECO and Imperial customer, informed Imperial that it wished to sell MEECO products in its stores, but that it wanted to consolidate the products under the Imperial brand.  MEECO agreed to allow the relabeling of its product, and assisted Imperial in the process.  It directed Alderwood Printery, which supplied MEECO with labels for its products, to provide new labels to Imperial to use in relabeling its product. The parties ultimately settled on labels that were similar to MEECO's labels, except that they replaced MEECO's name and logo with Imperial's name and logo.  Later, the parties agreed to extend the relabeling program to other Imperial "big box" customers.

In early 2002, the parties reached the apex of their acquisition negotiations.  The parties prepared a draft acquisition agreement.  MEECO provided information to Imperial about its customers and its products.  Imperial and MEECO jointly issued a notice that MEECO and its affiliated "Heatsafe"[1] brand would "soon officially become the newest

---

[1]MEECO sells its products under two brands: the MEECO Red Devil brand and the "Heatsafe" brand.  Most of the disputes here concern the Red Devil brand.

ORDER – 2

members of our [Imperial] family." Brooks Decl. Ex. E. For reasons that are hotly disputed and largely irrelevant, the parties never consummated the acquisition. In September 2002, Imperial acquired Kel Kem, a Canadian entity that manufactured products similar to MEECO's. Although Imperial allegedly told MEECO that it intended to continue supplying United States customers with MEECO products, the parties' relationship began to sour.

MEECO terminated its relationship with Imperial in 2003. MEECO claims that the volume of orders from Imperial had dropped precipitously, and that it discovered that Imperial was selling relabeled MEECO products to customers other than "big box" stores. On May 1, 2003, MEECO sent a letter to Imperial demanding that it stop selling goods bearing MEECO's trademarks.

When it received MEECO's letter, Imperial had a substantial inventory of MEECO product in its warehouses. Imperial placed Imperial labels on its entire inventory of MEECO products and sold much of it to TruServ Corporation ("TruServ"), the wholesale provider for True Value hardware stores.

The parties' courtship and messy breakup led to this action. MEECO's complaint alleges breach of contract, misappropriation of trade secrets, infringement of its copyrights, trademarks, and trade dress, and violations of the Washington Consumer Protection Act ("WCPA"). Imperial's counterclaims allege that MEECO's trade secret claims are in bad faith, and that MEECO tortiously interfered with its business relations.

### III.   DISCUSSION

Five of the pending motions seek summary judgment. In reviewing them, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is proper where there is no genuine issue of material fact and the

ORDER – 3

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

moving party bears the initial burden to demonstrate the absence of a genuine issue of

material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving

party has met its burden, the opposing party must show that there is a genuine issue of

fact for trial.  <u>Matsushita Elect. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87

(1986).  The opposing party must present significant and probative evidence to support

its claim or defense.  <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551,

1558 (9th Cir. 1991).  Where a question presented is purely legal, summary judgment is

appropriate without deference to the non-moving party.

**A.    MEECO's Contract and Promissory Estoppel Claims Fail as a Matter of Law.**

MEECO and Imperial flirted with two contractual relationships, but were unable

to commit.  First, they attempted to formalize a contract under which Imperial would

acquire MEECO.  Although the parties drafted an acquisition agreement, neither party

signed it.  Brooks Decl. Ex. L.  In the midst of the acquisition negotiations, MEECO

made at least one attempt to bind Imperial to a formal distribution agreement under which

Imperial would sell only MEECO products.  Brooks Decl. Ex. B.  Imperial refused to

enter the agreement.  MEECO nonetheless alleges that Imperial was contractually bound,

or that alternatively, Imperial made promises to MEECO that would allow it to recover

damages under a promissory estoppel theory.

**1.    There Is No Evidence of an Acquisition or Distribution Contract Between the Parties.**

The court grants summary judgment on MEECO's breach of contract claims

because MEECO has no evidence of a valid contract between the parties.  Indeed, it is

ORDER – 4

unclear from MEECO's briefing whether it has abandoned its breach of contract action.[2]
It expressly abandons any claim for breach of an acquisition agreement.  MEECO
Contract & Trade Secret Opp'n at 3.  It introduces no evidence that there was any other
contract between the parties.  At oral argument, MEECO suggested that Imperial had
bound itself to an agreement by course of conduct, but the evidence shows that the only
course of conduct was Imperial's practice of buying MEECO products and selling them.
Imperial has presented uncontroverted evidence that the parties never entered an
acquisition contract or a distribution agreement.

  **2.  Imperial Made No Promise That Could Provide a Foundation for Promissory Estoppel.**

  MEECO attempts to rescue its contract claims under a promissory estoppel theory.
To bind Imperial under this theory, MEECO would have to establish five elements at
trial: (1) that Imperial made a promise that (2) it should reasonably have expected to
cause MEECO to change position, and (3) that MEECO changed position (4) in
justifiable reliance on the promise, in such a manner that (5) injustice can be avoided only
by enforcement of the promise.  Elliot Bay Seafoods, Inc. v. Port of Seattle, 98 P.3d 491,
494-95 (Wash. Ct. App. 2004).

  MEECO rests its promissory estoppel claim on two alleged Imperial promises.
MEECO contends that Mr. Caissie promised Mr. Schaefer in September 2002 that
Imperial's recent acquisition of Kel Kem would not affect its relationship with MEECO.
According to MEECO, Mr. Caissie promised to continue to serve U.S. suppliers with
MEECO products, and reiterated that promise in March 2003.  MEECO alleges that Mr.
Caissie promised that Imperial would either "continue to purchase products from

---

[2]MEECO asserts that Imperial breached the Confidentiality Agreement the parties signed
at the outset of the acquisition negotiations.  The court will address that claim in conjunction with
MEECO's closely related claim for misappropriation of trade secrets.  See infra Sect. III.B.

ORDER – 5

MEECO under their existing long-term distribution arrangement" or would acquire MEECO outright.  MEECO Contract & Trade Secret Opp'n at 7.

Assuming that Mr. Caissie made the alleged promises, the nature of the promises is fatal to MEECO's promissory estoppel claim.  Taking all facts as MEECO alleges them, Imperial promised to either acquire MEECO or continue under the parties' existing "distribution arrangement."  The distribution arrangement, however, consisted of nothing more than MEECO allowing Imperial to negotiate large-volume orders with major customers with the hope that MEECO would supply products to Imperial to fill those orders.  There is no evidence that the parties' "distribution arrangement" obligated Imperial to buy any MEECO products.  Imperial's promise was an empty one:  it would either buy MEECO or it would not; and if it did not, it had no obligations whatsoever.  Imperial therefore made no promise that would have induced MEECO's reasonable reliance.

MEECO's own evidence only bolsters the conclusion that Mr. Caissie's alleged promises in September 2002 and thereafter were not an appropriate basis for reliance.  MEECO contends that it relied on the promises by allowing Imperial to secure contracts with several customers, instead of independently competing for the business.  If MEECO's "reliance" was to stand back while Imperial captured business, the evidence shows that it began to "rely" before it had any Imperial promise to rely on.  For example, MEECO was aware that Imperial sent a letter to a buyer at Lowe's in April 2002 claiming that Imperial had purchased MEECO and was in the process of consolidating all manufacturing at an Illinois facility.  Feil Contract & Trade Secret Decl. Ex. C (mistakenly dated April 2001).  MEECO states that it would have pursued the Lowe's business independently if it had not been relying on Imperial's "promise."  The Lowe's transaction, however, took place in April 2002, five months *before* the first of Mr.

ORDER – 6

1    Caissie's alleged promises to Mr. Schaeffer.  At that point, MEECO had no promise to

2    rely on, but it nonetheless stood back and allowed Imperial to capture the Lowe's

3    business.  MEECO's actions reveal that it was not acting in reliance on a promise, but

4    rather on the hope that Imperial would capture the Lowe's business and MEECO would

5    benefit.  In other words, MEECO did not rely on a promise; MEECO gambled.  The

6    gamble paid off in the short term when MEECO was able to supply the product that

7    Imperial sold to Lowe's.  It did not pay off in the long term, as the parties were unable to

8    agree to either an acquisition or an ongoing business relationship.  Absent evidence of a

9    promise on which MEECO could have reasonably relied, promissory estoppel cannot

10   salvage MEECO's gamble.

11

12   **B.     With One Narrow Exception, MEECO Has No Evidence that Imperial Used
13           Its Alleged Trade Secrets.**

14           MEECO claims trade secret protection for three types of information:  its customer

15   lists and pricing information for its customers, the chemical formulations of its products,

16   and the "composition and manufacturing method for its Creosote Destroying Firelog."

17   MEECO Contract & Trade Secret Opp'n at 13.

18           In order to prove misappropriation of trade secrets under Washington's version of

19   the Uniform Trade Secrets Act ("UTSA"), MEECO would have to demonstrate that its

20   claimed trade secrets are entitled to protection and that MEECO misappropriated those

21   secrets.  Ed Nowogroski Ins., Inc. v. Rucker, 971 P.2d 936, 942 (Wash. 1999).

22

23           MEECO's trade secret claims fail because MEECO cannot establish that Imperial

24   misappropriated any trade secret.  "Misappropriation" under the UTSA is either

25   "[a]cquisition of a trade secret of another by a person who knows or has reason to know

26   that the trade secret was acquired by improper means" or "[d]isclosure or use of a trade

27   secret of another without express or implied consent."  RCW § 19.108.010(2).  Assuming

28

ORDER – 7

for purposes of this order that MEECO has established that it has trade secrets, there is no dispute that MEECO voluntarily disclosed the trade secrets to Imperial in the course of their business relationship.  Thus, MEECO must establish that Imperial disclosed or used its trade secrets without its consent.

The court grants summary judgment on most of MEECO's trade secret claims because MEECO has presented insufficient evidence that Imperial ever used its alleged trade secrets.  MEECO has produced no evidence that Imperial ever disclosed or used its customer lists and pricing information[3] or the chemical formulation of its products.  When pressed to point to such evidence at oral argument, MEECO obliquely conceded it had none, stating that these claims were not the focus of this action.  Imperial has produced declarations from numerous executives establishing that Imperial never used that information.  No reasonable jury could find misappropriation from this evidence.

MEECO produces some evidence to support its claims regarding its Creosote Destroying Firelog.  Beginning in June 2002, Imperial and MEECO discussed developing a firelog product to compete with a popular chimney-sweeping firelog product already on the market.  MEECO already had a product in development.  MEECO claims that it provided Imperial with information about the composition of the product, including the use of a copper catalyst in the formulation.  Imperial ultimately declined to sell the MEECO firelog, and instead turned to Kel Kem to manufacture a competing product.  Kel Kem developed the "Supersweep" firelog, which also uses a copper catalyst, although there is no evidence that the Supersweep firelog uses the same copper catalyst as MEECO's firelog.  MEECO has also presented no evidence to contradict Imperial's evidence that it does not use MEECO's process to manufacture the SuperSweep.

---

[3]At oral argument, MEECO conceded that the prices its customers paid was not a secret, as those customers were free to disclose that information to Imperial or anyone else.

ORDER – 8

At best, MEECO's evidence could show that Imperial misappropriated the concept of using a copper catalyst in a firelog product. This will be quite difficult for MEECO to prove. Imperial's evidence shows that it hired Abe Kelly, the founder of Kel Kem, to assist them with developing the SuperSweep. Kel Kem already manufactured a soot destroying powder with a copper catalyst. The evidence shows that Mr. Kelly helped Imperial incorporate that technology into the SuperSweep product. All persons involved in developing the SuperSweep product deny having any information about MEECO's product. Nonetheless, on the record before the court, MEECO has provided just enough circumstantial evidence to establish an outside chance at convincing a jury that someone at Imperial improperly informed someone on its development team about MEECO's use of a copper catalyst in its firelog. MEECO's trade secret claim can thus proceed solely on that narrow basis.[4]

**C.     MEECO Has Not Provided Sufficient Evidence to Withstand Summary Judgment on Most of Its Trademark, Trade Dress, and Copyright Infringement Claims.**

MEECO's claims of trademark infringement, trade dress infringement, copyright infringement, and violations of the WCPA all focus on Imperial's relabeling of MEECO products under the Imperial trademark. There is no dispute that initially, MEECO not only permitted Imperial to relabel its goods, it actively assisted Imperial by assigning its own label provider to design the Imperial labels. Initially, Imperial's relabeling accommodated Lowe's request to sell only Imperial-branded products in its stores. The parties later agreed to expand the relabeling effort to accommodate other "big box" customers. MEECO alleges, and Imperial denies, that Imperial began selling relabeled

---

[4]MEECO's claims for breach of the confidentiality agreement with Imperial fail for the same reasons as its trade secret claims, with the exception of information regarding its Creosote Destroying Firelog.

ORDER – 9

MEECO products to TruServ before it sent its May 1, 2003 letter demanding that Imperial stop selling goods under the MEECO trademark.  Imperial concedes that after receiving the May 1, 2003 letter, it relabeled its entire inventory of MEECO products, and sold much of it to TruServ.

In addition to relabeling MEECO products, Imperial began selling similar types of products after exhausting its MEECO inventory.  It appears that Kel Kem manufactures these products.  At oral argument, Imperial was unable to point to any evidence refuting MEECO's allegation that the labels Imperial uses on these products are either identical to or substantially similar to the ones it used to relabel its MEECO products.  Imperial intends to use new labels on its products beginning in September 2005.

**1.     MEECO May Be Able to Prove Trade Dress Infringement.**

MEECO claims that the Imperial product labels infringe on its trade dress.  A product's trade dress is the "total image, design, and appearance of a product."  Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir. 2001).  Trade dress includes the "size, shape, color, color combinations, texture [and] graphics" used on a product.  MEECO claims trade dress protection solely in its product labels, not in its product containers or packaging.

To prevail on its trade dress claim at trial, MEECO would have to prove that its trade dress is nonfunctional, that it is inherently distinctive or has acquired secondary meaning, and that Imperial's use of a similar trade dress creates a likelihood of consumer confusion.  15 U.S.C. § 1125(a); Clicks Billiards, 251 F.3d at 1258; Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209-11 (2000).  MEECO's decision to confine its trade dress claims solely to its product labels eliminates any concern that its trade dress is functional.

As to whether MEECO's trade dress is inherently distinctive or has secondary meaning, a jury must decide this issue.  The court has the benefit of two prior orders addressing these issues.  (Dkt. ## 22, 87).  The court adopts analysis in those orders with a few additional comments.  The first is that MEECO has not consistently used a single trade dress.  The record before the court shows that some MEECO products use a yellow label background, whereas some use an all-white background.  Other than MEECO's name and the "Red Devil" logo, the only visual element that is consistent across the MEECO product line is the use of a thin red band across the top and bottom of its labels.  Because Imperial has unquestionably never used the Red Devil logo or the MEECO name on its labels, MEECO must necessarily focus on other elements of its trade dress to make a showing of distinctiveness that will impact the likelihood of consumer confusion in this case.  For that reason, MEECO's hope of establishing a protectable trade dress rests almost entirely on two thin red bands.  Thus, while the court agrees that MEECO faces "an uphill battle to establish that its trade dress is inherently distinctive" (Order at 6 (May 13, 2004)), the court emphasizes that the slope of that hill is exceedingly steep.

If MEECO faces a steep climb in establishing secondary meaning or inherent distinctiveness, it faces a near cliff in establishing a likelihood of consumer confusion.  The likelihood of confusion is the "most important element" of the trade dress inquiry.  Clicks Billiards, 251 F.3d at 1264 (quoting Kendall-Jackson Winery Ltd. v. E & J Gallo Winery, 150 F.3d 1042, 1048 (9th Cir. 1998)).  In evaluating the likelihood of confusion, the court considers several factors, including evidence of actual confusion, Imperial's intent in selecting its trade dress, the similarity of the trade dress, the similarity of the products, and the strength of the alleged trade dress.  Clicks Billiards, 251 F.3d at 1265.

Three of these factors require little discussion.  There is insufficient evidence of Imperial's intent in selecting its trade dress to make any meaningful determination about

ORDER – 11

this factor.  The MEECO and Imperial products at issue are unquestionably similar, which weighs in MEECO's favor.  As previously noted, MEECO's trade dress is weak at best, and thus this factor weighs against MEECO.

MEECO's evidence of actual confusion deserves no weight.  There is no evidence that end-user consumers have confused MEECO's and Imperial's products, nor is there any survey evidence to demonstrate that they might confuse them.  Instead, MEECO relies on evidence that the websites of some stores, including the True Value website, have used pictures of MEECO products to illustrate written descriptions of Imperial products.  This is not evidence of confusion *as a result of the parties' trade dress*; this is (at best) evidence of confusion as a result of the tempestuous relationship between MEECO and Imperial.  Each of the websites at issue belongs to a supplier who formerly purchased its MEECO products directly from Imperial.  Now each supplier receives MEECO products from MEECO (if at all), and Imperial products from Imperial.  That the suppliers have in some cases not harmonized their websites to accurately reflect the status quo is perhaps indicative of neglect or oversight, but it is not evidence of confusion that arises from the trade dress of the products.  Of course, these suppliers' websites might confuse end user customers about the origin of the products – but MEECO must take that issue up with the suppliers.  It is not Imperial's fault.

The critical factor in this case is the lack of similarity between the two trade dresses at issue.  The court focuses on two visual elements:  the combination of the trade name and logo used on the product labels, and the background color of the product labels.  As used in the parties' trade dresses, the MEECO name and MEECO Red Devil logo are not remotely similar to the Imperial name and Imperial logo.  <u>Compare</u> Terwilliger Decl. Ex. O (showing MEECO name and logo on product labels) <u>with</u> Terwilliger Decl. Ex. P

ORDER – 12

(showing Imperial name and logo on comparable product labels).  The names and logos are the most prominent feature of each parties' labels.

Moreover, the parties' use of different label colors only highlights the distinction between the parties' trade dress.  The record shows that with the exception of a single "Creosote Eliminator Log," Imperial labels are always on a yellow background.  Hayes Decl. Ex. E; Feil Decl. Ex. B; Childs Decl. Ex. A (showing "Creosote Eliminator Log").  While some MEECO product labels have yellow backgrounds, some are on an all-white background.  Hayes Decl. Ex. E (showing majority of MEECO products on all-white background); Feil Decl. Ex. B (showing that all relabeled MEECO products have all-white background); Terwilliger Decl. Ex. O (close-up image of one all-white MEECO label and one on a yellow background).

The court holds there is no likelihood of confusion, as a matter of law, between Imperial's yellow-background labels and MEECO's all-white-background labels.  The stark color contrast, coupled with the wholly different trade name and logo featured prominently on each label, means that the labels could not confuse any reasonable consumer about the origin of the products.

As to the parties' products that use the same all-white or all-yellow backgrounds, although the differences in the trade names and logos make consumer confusion highly unlikely, the court cannot hold that there is no likelihood of confusion as a matter of law.

The parties have not presented their respective product lines in a way that allows the court to determine what products its ruling will eliminate from trial.  The court therefore orders that at the pretrial conference, the parties must identify the products at issue in the trade dress claims.  The parties shall meet and confer beforehand.  MEECO shall identify with specificity all of the products for which it claims trade dress protection in light of this order, and Imperial shall identify its product or products that are

ORDER – 13

comparable to the asserted products.  If the parties are unable to agree on the products still at issue, they will present all such products at the hearing, after which the court will indicate which products can proceed to trial.

### 2.   MEECO's Reverse Passing Off Trademark Claim Can Proceed to a Jury, Subject to Imperial's Defenses.

MEECO's trademark claim is not a typical infringement claim, but rather a claim of "reverse passing off."  MEECO does not contend that Imperial ever used MEECO trademarks or similar trademarks; instead it contends that Imperial relabeled MEECO products without authorization.  See Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc., 7 F.3d 1434, 1437 (9th Cir. 1993) ("'Express reverse passing off' occurs when one party purchases or otherwise obtains a second party's goods, removes the second party's name, and then markets the product under its own name.").  There is no dispute that Imperial relabeled MEECO's product – the only dispute is whether MEECO authorized the relabeling.  The court addresses that issue in Section III.C.4, infra.

Imperial has another potential defense to the reverse passing off claim – trademark misuse.  In its May 1, 2003 letter, MEECO demanded that Imperial "cease and desist the sale of any merchandise that bears the MEECO'S RED DEVIL logo."  Terwilliger Decl. Ex. C.  The letter insisted that trademark law gave MEECO the right to stop Imperial from selling MEECO branded goods.  Id.

MEECO's cease and desist letter clearly misstated trademark law.  The Lanham Act gives any purchaser of a trademarked product the right to make the "first sale" of the product to another purchaser.  Sebastian Int'l Inc. v. Longs Drug Stores Corp., 53 F.3d 1073, 1074 (9th Cir. 1995).  There is no dispute that Imperial had purchased all of the MEECO product it had in inventory.  In its letter, MEECO insisted that Imperial's sale of MEECO products "constitutes trademark infringement and unfair competition"

ORDER – 14

(Terwilliger Decl. Ex. C), in sharp contrast to Ninth Circuit law holding that such sales are "neither trademark infringement nor unfair competition." <u>Sebastian Int'l</u>, 53 F.3d at 1073.

As meritless as MEECO's cease and desist letter was, Imperial's response was equally dubious.  Rather than simply exercise its right to sell its MEECO inventory, it claims that MEECO's letter forced it to place Imperial labels on all of its MEECO inventory.  Defs.' Mot. at 22.  Imperial asserted for the first time at oral argument that it did not have advice of counsel when responding to the May 2003 letter.

MEECO's assertion of non-existent trademark rights may constitute trademark misuse.  Courts invoke this defense to ensure fairness when a trademark holder attempts to use its trademark to control conduct beyond the rights the Lanham Act confers.  <u>See, e.g.</u>, <u>Juno Online Servs., L.P. v. Juno Lighting, Inc.</u>, 979 F. Supp. 684, 687-88 (N.D. Ill. 1997) (describing trademark misuse defense and its relationship to patent and copyright misuse); <u>Tveter v. AB Turn-O-Matic</u>, 633 F.2d 831, 839 (9th Cir. 1980) (noting the need for a nexus between the mark holder's misuse and the trademark right he seeks to enforce).  Some courts refer to the defense as "unclean hands."  <u>E.g.</u>, <u>Fuddruckers, Inc. v. Doc's B.R. Others, Inc.</u>, 826 F.2d 837, 847 (9th Cir. 1987) ("To prevail, the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims."); <u>Levi Strauss & Co. v. Shilon</u>, 121 F.3d 1309, 1313 (9th Cir. 1997).

On the record before the court, neither the details of MEECO's inequitable conduct nor Imperial's dubious response are sufficiently clear to permit it to decide if trademark misuse bars MEECO's reverse passing off claims.  If this matter proceeds to trial, the court will revisit the defense on a proper motion from Imperial.

ORDER – 15

**3.      MEECO's Copyright Infringement Claims Barely Pass Muster.**

**a.      The Court Grants MEECO's Motion for Consolidation.**

Before addressing MEECO's copyright infringement claims, the court must decide whether to hear all of MEECO's copyright claims at once.  MEECO seeks to consolidate this action with Case No. 05-681, a second case asserting copyright claims against Imperial.  MEECO also asks the court to hear Case No. 05-681 on the same calendar as the instant case.  This is a brassy request, given that discovery in this action has closed, and trial is just over a month away.

MEECO brought Case No. 05-681 to assert claims under several newly registered copyrights.  Under the Copyright Act, a party cannot sue for copyright infringement until it has obtained a certificate of registration from the United States Patent and Trademark Office ("PTO").  17 U.S.C. § 411(a).  MEECO asserted no copyright registrations when it filed this action on October 13, 2003, and asserted two newly-acquired registrations in its first amended complaint on October 27, 2003.  MEECO obtained four additional registrations between then and April 2004.  After obtaining leave of court in March 2005, MEECO filed a second amended complaint that asserted no additional copyright registrations.  In April 2005, it filed Case No. 05-561.[5]

The court finds MEECO's assertion of its copyrights to be sloppy and untimely, but will consolidate the two cases nonetheless.  MEECO offers no explanation for why it waited almost a year to formally assert its newly acquired copyrights.  It offers no explanation for why it moved to amend its complaint a few months ago without mentioning the newly acquired copyrights.  Other than an unsupported argument that

---

[5]The Honorable John C. Coughenour originally presided over Case No. 05-561, but transferred it to this court on April 12, 2005.

ORDER – 16

some courts "prefer" a new action on newly-acquired copyrights over an amendment to an existing complaint, MEECO has no response to Imperial's assertion that its consolidation motion is a thinly veiled attempt to circumvent the requirements for amending a complaint.  The court grants the consolidation motion only because it is convinced that consolidation will cause no prejudice to Imperial.  Imperial does not need additional discovery to meet the new claims because they arise out of the same conduct – Imperial's alleged copying of the text of MEECO's product labels – as MEECO's previously asserted copyright claims.  The claims are identical in all but the wording of the copyrighted text at issue – so much so that Imperial's current arguments for summary judgment are more than adequate to meet the newly asserted claims.  Because the claims are so closely related, it would be a waste of the parties' and the court's resources to hear the two cases separately.[6]

### b. Neither Party is Entitled to Summary Judgment on MEECO's Copyright Claims.

In addition to its trade dress and trademark rights, MEECO claims copyright protection for the text of the labels on its products.  MEECO's copyright registrations cover these texts.  There is no dispute that some of Imperial's labels reproduce these texts verbatim, or nearly verbatim, on labels used to relabel MEECO products.  Although it is not clear from the record, Imperial apparently still uses those texts on its current product labels.

Imperial focuses not on its use of MEECO's texts, but rather on its claim that those texts are not entitled to copyright protection because they are unoriginal.  "The *sine qua non* of copyright is originality."  <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S.

---

[6]If Imperial is able to identify specific evidentiary prejudice it suffered as a result of MEECO's untimely assertion of its new copyrights, the court will consider imposing appropriate evidentiary sanctions at trial.

ORDER – 17

340, 345 (1991). To earn copyright protection, a work must be the original composition of its author. Id. The originality bar is not high. Id. ("[T]he requisite level of creativity is extremely low; even a slight amount will suffice."). Imperial nonetheless argues that MEECO's label texts are unoriginal.[7]

A reasonable jury could find that MEECO's label texts display the requisite level of creativity for copyright protection. The court focuses on a representative text from the label of MEECO's Powder Soot Remover:

> Helps prevent chimney fires by minimizing the buildup of soot, a combustible by-product of burning solid fuels, particularly green or unseasoned wood. . . . Powder Soot Remover improves heating efficiency by oxidizing and removing the insulation soot barrier in chimneys and flues, where it has the potential to ignite. . . . Sprinkle one tablespoon over brisk fire. Use with every fire. Open draft controls and allow fire to burn briskly for five minutes after application. Keep can tightly closed and store in a dry place. Dampness will decrease effectiveness. Noncombustible in storage.

Terwilliger Decl. Ex. O. Imperial's Powder Soot Remover bears a nearly identical label. Id. Ex. P. MEECO's text is not likely to win a Pulitzer Prize, but that does not make it unoriginal. See Feist, 499 U.S. at 345 ("The vast majority of works make the [originality] grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be.") (internal quotation omitted). MEECO's texts display relatively little creativity.[8] In a case where Imperial's texts were merely similar, rather than copied nearly verbatim, it might be possible to find that its texts were non-infringing as a matter

---

[7]Although it is not clear from the record before the court, it appears that MEECO's copyrights are not subject to a statutory presumption of originality. 17 U.S.C. § 410(c) (creating presumption for works registered within five years of first publication); Schaeffer Decl. ¶ 4 (stating that he authored the MEECO label texts in 1992 and 1993).

[8]The court focuses on the descriptive text and instructions in MEECO's labels. It appears that MEECO's ingredient lists and consumer warnings are not copyrightable.

ORDER – 18

of law.  Imperial's wholesale appropriation of MEECO's label texts prevents that determination here.  A jury must decide the infringement and originality questions.[9]

Additionally, the court finds no merit in Imperial's claim that the *scènes à faire* doctrine negates MEECO's copyrights.  That doctrine provides that where certain expressive elements are inherent in a concept, it is not copyright infringement to use those elements.  See, e.g., Cavalier v. Random House, Inc., 297 F.3d 815, 823 (9th Cir. 2002) (finding no copyright in "Scenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise.")  The doctrine is not applicable here.  MEECO cannot claim copyright in the concept of instructing users of powder soot remover, but it is clear to the court that there are many ways to express the concept other than the one MEECO has chosen.  There is plainly more than one way to instruct users of fireplace products.  Cf. MARK TWAIN, A CONNECTICUT YANKEE IN KING ARTHUR'S COURT 321 (Allison R. Ensor ed., W.W. Norton & Co. 1982) (1889) (invoking similar adage about cats).  Imperial chose to instruct its customers by copying MEECO's texts nearly word-for-word, and did so at its peril.

Neither party is entitled to summary judgment on MEECO's copyright claims.  The court denies Imperial's motion as it pertains to copyright for the reasons stated

---

[9] It appears that, since Feist, no Ninth Circuit court has squarely addressed whether originality is a question for the jury or for the court.  Cf. Newton v. Diamond, 204 F. Supp. 2d 1244, 1253 (C.D. Cal. 2002) (stating without analysis that Feist requires a court to decide the "protectability of elements of a copyrighted work"); Los Angeles News Service v. Tullo, 973 F.2d 791, 793 (holding, before Feist, that originality is a mixed question of law and fact).  The court assumes that the Ninth Circuit would follow the majority of circuits that hold that originality is a jury question.  E.g., CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1517 (1st Cir. 1996); Matthew Bender & Co. v. West Publ'g Co., 158 F.3d 674, 681 (2d Cir. 1998).

ORDER – 19

above.[10]  As to MEECO's cross-motion, the uncertainty of the scope and duration of the license between the parties (see infra Sect. III.C.4) prevents the court from deciding whether Imperial's relabeled MEECO products infringe MEECO's copyrights.  As to Imperial's new line of products (presumably manufactured at its newly acquired Kel Kem facilities), MEECO has not provided a record that permits the court to compare those products' labels to MEECO's copyrighted texts.  Moreover, MEECO has not provided a record that allows the court to determine whether it is entitled to statutory damages under the Copyright Act.  See 17 U.S.C. 412 (barring statutory damages for infringement before registration of a copyright).  As there is no evidence that Imperial profited from its use of MEECO's label texts, MEECO will have difficulty establishing that it is entitled to actual damages.  See Polar Bear Prods. v. Timex Corp., 384 F.3d 700, 708 n.5 (9th Cir. 2004) (noting that copyright holder must establish actual damages to prevail on claim for infringement of unregistered copyright).

**4.      Imperial's Implied License May Provide a Defense to All of MEECO's Intellectual Property Infringement Claims.**

To conclude its discussion of MEECO's trade dress, trademark, and copyright infringement, the court notes that a jury must decide if Imperial's implied license to use MEECO's intellectual property provides a defense to all three claims.  There is no question that MEECO allowed and encouraged Imperial to use Imperial labels on its products, at least initially.  MEECO knew that this necessarily meant that Imperial would

---

[10]The court finds little merit in Imperial's defense that it was the joint author of the copyrighted texts or of the Imperial trade dress.  The evidence shows, at most, that Imperial approved the final version of the labels after providing minimal input.  There is no evidence that Imperial contributed to the authorship of the label texts, and thus Imperial cannot succeed on this claim as a matter of law.  As to Imperial's contribution to the trade dress of the labels, a jury can decide if the contributions rose to the level of joint authorship.

ORDER – 20

use what it contends is MEECO's trade dress, would "pass off" MEECO goods as Imperial goods, and would use the copyrighted portions of MEECO's label texts.  See generally Effects Assoc., Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990) (discussing implied license defense).

Although it is clear that Imperial had an implied license, the scope of that license is not readily apparent.  MEECO contends that the license extends no further than permitting Imperial to sell relabeled MEECO product until MEECO insisted that it cease to do so.  See Irwin v. Amer. Interactive Media, Inc., No. CV 93-1403 RG, 1994 U.S. Dist. LEXIS, at *10-11 (C.D. Cal. Apr. 18, 1994) (interpreting terms of implied license); Kolton v. Universal Studios, Inc., No. CV 03-8842 PA (JTLx), 2004 U.S. Dist. LEXIS 27359, at *9-11(same).  Imperial claims that the license had broader scope.[11]  Imperial also contends that MEECO's attempt to terminate the implied license was ineffective. See Irwin, 1994 U.S. Dist. LEXIS at *17 (noting that implied licenses are not terminable at will); Kolton, 2004 U.S. Dist. LEXIS at *12-13 (same).

The record before the court does not permit a legal conclusion on the scope and duration of the implied license.  Both parties are free to present evidence at trial that would permit the court to decide the terms of the license, and to permit the jury to decide whether Imperial's conduct exceeded the license, or whether MEECO properly terminated the license.

---

[11] The court notes that there is evidence supporting Imperial's claim of a license with broad scope and duration.  For example, despite its claims that Imperial's labels infringe its intellectual property, it appears that MEECO initially hoped that Imperial would "buy back" all Imperial labels that MEECO had in stock.  Feil Contract & Trade Secret Decl. Ex. B.

ORDER – 21

### 5. MEECO Has No WCPA Claim Because It Suffered No Business Injury as a Result of Imperial's Labels.

Imperial apparently continues to use product labels that adopt text from MEECO's labels, to the extent that some Imperial products boast ingredient lists from MEECO products. MEECO contends that some Imperial products do not contain the ingredients they boast.

To prove a claim under the WCPA, a plaintiff must offer evidence that: (1) a defendant committed an unfair or deceptive act or practice; (2) in conducting trade or business; (3) affecting the public interest; (4) injuring the plaintiff in her business or property; and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 719 P.2d 531, 533 (Wash. 1986). The court must decide if a given set of facts makes out an actionable WCPA claim. Svendsen v. Stock, 23 P.3d 455, 458 (Wash. 2001).

Assuming MEECO's allegations to be true, the court finds no injury cognizable under the WCPA.[12] To the extent that the court can decipher MEECO's claim, it appears that MEECO alleges that Imperial's product labels mislead consumers and injure MEECO. MEECO Intellectual Property Opp'n at 17 (stating that consumers are "unable to distinguish [MEECO] products from those falsely claiming similarity to MEECO's products in composition or performance"). As an example, it points to Imperial's gel alcohol firestarter product, whose label states that it contains denatured alcohol. MEECO

---

[12]Under some circumstances, the WCPA provides remedies for trade dress and trademark infringement. See, e.g., Nordstrom, Inc. v. Tampourlos, 733 P.2d 208, 210 (Wash. 1987) (holding that trade name infringement is actionable under the WCPA). MEECO does not claim WCPA remedies for those alleged violations.

ORDER – 22

contends that the product instead contains isopropanol, which does not burn as hot or as long as a product with denatured alcohol.

MEECO's alleged injury is insufficient for at least three reasons.  First, there is no evidence that MEECO has ever attempted to promote its products based on the superiority of its ingredients.  Second, the court finds no evidence that customers would seize upon the distinction between denatured alcohol and isopropanol on a small ingredient label when purchasing competing firestarter products.  Third, there is no evidence that any discrepancy on an Imperial's ingredient label has confused or harmed any consumer.  Absent such evidence, the court concludes that MEECO has suffered no injury, and thus has no WCPA claim.

**D.     Imperial's Tortious Interference Counterclaim Fails as a Matter of Law.**

When MEECO sent Imperial the May 1, 2003 letter improperly demanding that Imperial cease selling MEECO's products, it sent a copy to John Clapp, a buyer for TruServ.  Imperial contends that MEECO knew that Imperial had to fill a large order for MEECO products from TruServ, that it sent the letter to Mr. Clapp in an effort to sabotage that order, and that MEECO's conduct constitutes tortious interference with its contractual relationships.

Under Washington law, there are five elements to Imperial's claim:

> (1) the existence of a valid contractual relationship or business expectancy;
> (2) that defendants had knowledge of that relationship; (3) an intentional
> interference inducing or causing a breach or termination of the relationship
> or expectancy; (4) that defendants interfered for an improper purpose or
> used improper means; and (5) resultant damage.

Leingang v. Pierce County Medical Bureau, 930 P.2d 288, 300 (Wash. 1997).

The court grants MEECO's motion for summary judgment on this counterclaim because Imperial cannot, as a matter of law, establish the third element of its claim. However improper MEECO's attempt at interference might have been, it was ineffective.

ORDER – 23

Imperial filled the TruServ order with relabeled goods.  There was no "breach or termination" of Imperial's relationship or expectancy, and thus there was no actionable interference.

Even ignoring the lack of a breached or terminated relationship, there is also no evidence that MEECO's conduct caused Imperial damage.  The only damage Imperial claims from MEECO's alleged interference is approximately $25,000 that it expended to relabel its inventory of MEECO products.  Imperial sustained this "damage" because it chose to relabel all of its MEECO inventory in response to MEECO's baseless assertions that Imperial could not sell its trademarked goods.  See supra Sect. III.C.2.  The court need not decide whether Imperial acted knowingly or in ignorance of the first sale doctrine when it chose to relabel its MEECO inventory.  In either case, the court holds that the cost of the relabeling is attributable to Imperial, not MEECO.

**E.      The Court Finds Insufficient Evidence to Dismiss Imperial Sheet Metal From This Action.**

In the final motion before the court, Imperial seeks summary judgment on all claims against Imperial Sheet Metal, Ltd. ("ISM").  There is no dispute that ISM does not manufacture any of the products at issue in this case.  According to MEECO, it named ISM as a defendant because ISM is the "dominant player" in the Imperial Manufacturing Group, because ISM is the only Imperial entity that paid MEECO for its products, and because many of the letters threatening litigation against MEECO came from Canadian solicitors who stated that they represented ISM.

The court finds that MEECO has provided sufficient evidence to raise a genuine issue of material fact over whether ISM is ultimately liable for some or all of the conduct at issue in this litigation.  Although ISM appears to have no reason to be involved in this dispute, it injected itself into it by acting on Imperial's behalf in making payments to MEECO and in making legal threats against MEECO arising out of the subject matter of

ORDER – 24

this action.  ISM's conduct indicates that it has control over the Imperial entities who are involved in this dispute.  Under these circumstances, the court cannot determine as a matter of law that ISM is not a proper defendant.

## IV.   CONCLUSION

For the reasons stated above, the court disposes of the parties' motions as follows:

(1)   The court GRANTS Imperial's motion for summary judgment on MEECO's contract and trade secret claims in part and DENIES it in part (Dkt. # 146).  The court dismisses MEECO's claims based on contract and promissory estoppel theories.  The court also dismisses MEECO's trade secret claims, except for the claim that Imperial misappropriated its concept for the use of a copper catalyst in its SuperSweep product.

(2)   The court GRANTS MEECO's motion for an extension of time to respond to the above motion (Dkt. # 185).[13]

(3)   The court GRANTS in part and DENIES in part Imperial's motion for summary judgment on MEECO's trade dress, trademark, copyright, and WCPA claims (Dkt. # 154).  The court dismisses MEECO's WCPA claim. MEECO's remaining intellectual property claims can proceed, subject to the limitations the court set forth above.

(4)   The court GRANTS MEECO's motion to consolidate this action with Case No. 05-681 (Dkt. # 163).

(5)   The court DENIES MEECO's motion for summary judgment on its copyright claims (Dkt. # 164).

(6)   The court GRANTS MEECO's motion for summary judgment on Imperial's tortious interference counterclaim (Dkt. # 167).

(7)   The court DENIES Imperial's motion for summary judgment on all claims against Imperial Sheet Metal, Ltd. (Dkt. # 142).

---

[13] The conduct of both parties with respect to this motion disappoints the court.  MEECO failed to file a timely opposition despite the court's earlier denial of its motion for extension of time for all of its summary judgment oppositions.  Imperial unreasonably harped on the one-day delay in receiving the opposition, even though it could have easily cured any prejudice by obtaining an extension for its reply brief.

ORDER – 25

1   The parties are ordered to file their joint pretrial order no later than 3:00 p.m. on

2   June 8, 2005.  The parties shall appear for a pretrial conference at 10:30 a.m. on June 9,

3   2005.  If the parties file motions in limine, they shall do so no later than June 10, and

4   they shall be noted for consideration on June 17, 2005.

5          DATED this 26th day of May, 2005.

6

7

8                                                    _____

9                                                    JAMES L. ROBART

10                                                   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER – 26