UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MEECO MANUFACTURING CO., INC.,

Plaintiff,

v.

IMPERIAL MANUFACTURING GROUP, et al.,

Defendants.

CASE NO. C03-3061JLR

FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

This matter came before the court on a bench trial from June 21, 2005 through June 24, 2005. After considering the evidence presented at trial and the parties' opening statements and closing arguments, the court issues the following findings of fact and conclusions of law. At the close of Plaintiff's case, Defendants made a motion for judgment on partial findings under Fed. R. Civ. P. 52(c). The court granted that motion in part, and made oral findings of fact and conclusions of law. The court has incorporated those findings and conclusions here.

## II. FINDINGS OF FACT

1. Plaintiff MEECO Manufacturing Company, Inc. ("MEECO") is a Washington corporation whose principal place of business at all relevant times was in either Seattle or Everett, Washington.

2. MEECO manufactures fireplace and stove products, including creosote cleaning chemicals, stove paint, stove gasketing, and related products.

3. Defendant Imperial Manufacturing Group is an unincorporated association of Canadian corporations, including Defendant Imperial Sheet Metal, Ltd. Unless the distinction is important, the court will refer to these entities collectively as "Imperial." Imperial's principal place of business is in Richibucto, New Brunswick.

4. Defendant Normand Caissie is the President and Chief Operating Officer of Imperial, and is the sole stockholder of Imperial Sheet Metal, Ltd. The court finds that Mr. Caissie took all of the actions relevant to the instant dispute in his capacity as a corporate officer.

5. MEECO and Imperial began a business relationship after Mr. Caissie met MEECO owner Clark Schaefer at an industry convention. Imperial began distributing MEECO products. There was no ongoing agreement governing the distribution relationship. Imperial simply purchased MEECO products according to its needs and resold them.

6. In approximately June 2000, MEECO and Imperial entered discussions for Imperial to acquire MEECO. The parties entered a confidentiality agreement in 2000. Although Imperial continued to discuss acquiring MEECO for several years, the acquisition never occurred.

7. In approximately September 2002, Imperial acquired Kel-Kem, Ltd., a Canadian manufacturer of fireplace and stove products. Mr. Schaefer was concerned that the Kel-Kem acquisition meant that Kel-Kem would displace MEECO as Imperial's supplier. Soon after the acquisition, Mr. Caissie assured Mr. Schaefer over the telephone that he intended to continue to use MEECO to supply its

United States customers. Despite Mr. Caissie's assurances, Mr. Schaefer learned information that led him to believe that Imperial was preparing to cease purchasing products from MEECO.

8. By May 2003, Mr. Schaefer moved to terminate the parties' business relationship.

**Facts Relevant to the Parties' Trademarks and Trade Dress**

9. MEECO sells many of its products under its registered MEECO "Red Devil" trademark. MEECO owns United States Trademark No. 1,546,926 covering the MEECO Red Devil mark. MEECO also sells some of its products under its "Heatsafe" trademark.

10. Initially, Imperial sold all MEECO products as MEECO Red Devil or Heatsafe trademarked goods.

11. In early 2001, Lowe's Hardware Stores ("Lowe's"), which had sold MEECO products and Imperial products in the past, sought to reduce the number of fireplace product brands sold in its stores. It requested that Imperial label all products that it provided to Lowe's as Imperial products. Imperial informed MEECO of this request and MEECO agreed to permit Imperial to relabel its products sold to Lowe's.

12. MEECO assisted Imperial in developing "private labels" to meet Lowe's demands. The private labels were for 16 products sold at Lowe's, and were based on MEECO's existing Red Devil or Heatsafe labels for those products. Mr. Schaefer worked with a third-party printer that MEECO had used in the past to develop labels for Imperial. He did little more than replace the MEECO name and logo with the Imperial name and logo on his existing labels. With perhaps one exception, the private labels for all products were on an all-yellow background

with a thin red band across the top of the label and a thin red band across the bottom of the label. None of the private labels contained any MEECO trademark or used the name "MEECO." All prominently featured a stylized "Imperial" logo and, occasionally, a stylized crown logo as well.

13. Imperial approved the final format of the private labels, including the selection of the all-yellow background color, but the private labels were heavily derived from MEECO's existing labels.

14. The principal differences between MEECO's existing labels and the Imperial private labels were the very prominent display of the Imperial logo in place of the MEECO logo as well as the background color of the labels. While all (or virtually all) of the private labels were on all-yellow backgrounds, the MEECO labels on corresponding products were often on all-white backgrounds.

15. The most consistent similarity between MEECO's existing labels and the Imperial private labels was the use of the two thin red bands at the top and bottom of the labels. Although the private label texts were substantially similar to the MEECO labels, they were often displayed somewhat differently or in a different font.

16. MEECO presented little evidence regarding whether the purchasing public associates its trade dress with MEECO, whether MEECO's trade dress has remained consistent in the past, and whether it has sought to maintain exclusive use of the trade dress.

17. At some point, MEECO permitted Imperial to use private labels in making a sales presentation to representatives from Home Depot, Inc. Imperial never sold private label goods to Home Depot.

18. In 2002, MEECO agreed to permit Imperial to sell certain products to Tractor Supply, a regional chain of stores in the Midwest, under the Imperial private label.

After this agreement, there is no evidence that the parties agreed to permit Imperial to sell private label goods (whether they originated with MEECO or with another manufacturer) to any other customer.

19. On May 1, 2003, Mr. Schaefer sent a letter to Imperial demanding that Imperial "cease and desist the sale of any merchandise that bears the MEECO'S RED DEVIL logo." The letter insisted that trademark law gave MEECO the right to stop Imperial from selling MEECO-branded goods.

20. Imperial did not contact MEECO to discuss the cease and desist letter. Instead, it relabeled all or substantially all of its MEECO-branded inventory with Imperial private labels. It accomplished the relabeling by directing "Challenge," a printer near Imperial's Hamel, Illinois warehouse, to print Imperial private labels. Imperial affixed the private labels over the top of MEECO labels on its existing inventory. It sold most of the relabeled inventory to True Value Hardware Stores ("True Value").

21. Imperial did not have MEECO's permission to relabel its existing inventory for sale to True Value.

22. Imperial claims that Mr. Schaefer's May 1, 2003 cease and desist letter forced it to relabel its existing inventory with Imperial private labels, but the court finds little evidence to support this claim. The court finds that Imperial had several options in light of the cease and desist letter, including returning its inventory to MEECO, ignoring the cease and desist letter, or suing MEECO for interfering with the lawful sale of MEECO products.

23. Imperial's relabeling of its MEECO inventory damaged MEECO by keeping MEECO-labeled products out of the marketplace and depriving MEECO of the goodwill associated with its product sales. In addition, any customer who

discovered the relatively crude overlabeling of the MEECO products would be misled into believing there was an ongoing relationship between Imperial and MEECO.

24. Imperial's relabeling of its MEECO inventory was deliberate and willful.

25. After it had exhausted its inventory of MEECO products, Imperial began meeting customers' needs by selling product manufactured at Kel-Kem. Imperial labeled those products either with Imperial private labels or with "next-generation" labels. The next-generation labels were almost identical to the Imperial private labels, except Imperial changed the styling of the "Imperial" name and in most cases removed the stylized Imperial crown logo.

26. Imperial continues to use the next-generation labels, although it will introduce a new generation of labels on all of its products in September 2005. The new labels bear little resemblance to Imperial's private labels or next-generation labels.

27. MEECO presented no direct evidence that similarities between Imperial's private labels or next-generation labels confused any consumer of the products as to the products' true source.

28. Even after Imperial ceased to supply MEECO products, the True Value national website continued to use pictures of MEECO products adjacent to written descriptions of Imperial products. There was no evidence that either MEECO or Imperial was aware of this until 2005, when MEECO pointed it out in the course of this lawsuit.

29. MEECO presented evidence that Imperial had the capability to directly control the content of the True Value website through its "Vendor Managed Data" ("VMD") system. The court finds that evidence unpersuasive. MEECO presented little to no evidence that Imperial knew about the errors on the True Value website.

MEECO presented little to no evidence that Imperial intended for the True Value website to use MEECO product pictures.

30. The court finds that MEECO has not proven that any sales of Imperial product from the True Value website are attributable to MEECO's product pictures.

**Evidence Regarding MEECO's Trade Secrets and Its "SuperSweep" Trademark**

31. MEECO originally asserted a broad range of trade secrets in this action, including that Imperial had misappropriated its customer lists, pricing information, and product formulations.

32. After the court's summary judgment order, MEECO was left with a single trade secret claim asserting that Imperial had misappropriated its concept for a creosote destroying firelog.

33. MEECO approached Imperial as early as June 2002 and informed it that it was developing a creosote destroying firelog product to compete with a similar product on the market.

34. In the course of developing the creosote destroying firelog, Mr. Schaefer disclosed some information about its composition and manufacturing process.

35. Imperial ultimately decided not to sell MEECO's creosote destroying firelog, and instead hired Abe Kelley, former owner of Kel-Kem, to develop a creosote destroying firelog. Mr. Kelley did so.

36. MEECO did not prove that anyone associated with Imperial used information learned from MEECO in developing the Imperial creosote destroying firelog.

37. While Imperial still intended to sell the MEECO creosote destroying firelog, Richard Hayes, Imperial's Vice-President for sales, suggested to Mr. Schaefer that the new firelog could be marketed under the name "Super Sweep" or "SuperSweep." Imperial had sold chimney brushes under the "SuperSweep" name

since well before its relationship with MEECO began. Mr. Hayes suggested that MEECO use the Super Sweep name to capitalize on the association with Imperial's existing chimney brush line. Mr. Hayes testified that Imperial had sold its line of chimney brushes across the United States under the SuperSweep name since at least 1986, although Mr. Hayes had only been at the company since the mid-1990s. Imperial intended that it would sell MEECO's Super Sweep firelog to the same customers to whom it had already been selling SuperSweep brushes.

38. Other than Mr. Hayes' testimony that Imperial sold SuperSweep brushes throughout the United States since 1986, the parties presented very little evidence regarding Imperial's United States sales of chimney brushes. A photograph of Imperial brushes sold at True Value shows that Imperial sells chimney brushes in the United States, but none of the brushes in the photograph bore the SuperSweep trademark. Other than Mr. Hayes' testimony, there was no evidence of the territorial extent of sales of the SuperSweep brushes in the United States. Mr. Schaefer testified that he had searched the PTO registry for evidence of Imperial's United States sales of SuperSweep brushes, but he had no direct information about whether Imperial sold the brushes in the United States.

39. The parties' creosote destroying firelogs serve the same purpose as Imperial's chimney brushes – eliminating the buildup of dangerous chemicals inside a chimney. Chimney brushes use a mechanical process, whereas creosote destroying products (including firelogs) use a chemical process.

40. Imperial began selling its creosote destroying firelog in the United States in October 2003 under the "SuperSweep" trademark.

41. MEECO first used the "Super Sweep" trademark in commerce on a MEECO creosote destroying firelog product at a trade show in March 2003. Mr. Schaefer

testified that he advertised the Super Sweep logs at the trade show, and sold a small number of the firelogs.

42. The court finds that Imperial has proven by a preponderance of evidence that it sold chimney brushes under the "SuperSweep" trademark before MEECO first used its Super Sweep mark in commerce.

43. In July 2003, MEECO filed an application with the United States Patent and Trademark Office ("PTO") to register the "Super Sweep" name as a trademark.

44. In October 2003, Imperial filed an application to register the "SuperSweep" name as a United States Trademark. In the application, it disclosed that it "intended to use" the trademark for fireplace products in the United States, but did not disclose any information about its prior United States sales of "SuperSweep" chimney brushes.

**Facts Relevant to MEECO's Copyright Claims**

45. MEECO is the owner of United States copyright registrations VA 1-208-319, VA 1-210-239, VA 1-208-101, VA 1-254-929, and VA 1-263-397. The earliest effective date for any of these registrations is October 17, 2003. Each of the copyright registrations covers text incorporated in MEECO's product labels.

46. In 1992 and 1993, Mr. Schaefer revised and updated the labels for all MEECO products. Mr. Schaefer testified that he authored the texts on the labels himself or he derived them from label texts as they existed on MEECO products when he purchased MEECO in 1987. Mr. Schaefer testified that he did not know who had authored the MEECO label texts that existed before he purchased the company.

47. Mr. Schaefer admitted that he copied at least one of the MEECO label texts from a non-MEECO source. Mr. Schaefer wrote the label text on MEECO's Creo-Shot

Chimney Cleaner product by copying the label text of a competing product that Rutland Manufacturing sold.

48. Both the Imperial private labels and the Imperial next-generation labels copied their texts verbatim or nearly verbatim from the corresponding MEECO product label. Imperial used the next-generation labels on its Kel-Kem manufactured products.

49. MEECO presented no evidence that any consumer of any Imperial products made the decision to purchase the product based on text of the product's label.

50. MEECO did not prove that any consumer of any Imperial product purchased the product in order to acquire the text of its label.

## III. CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over the federal claims in this matter pursuant to, inter alia, 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a). The court exercises its supplemental jurisdiction over the Washington state law claims in this matter.

2. The court concludes that Mr. Caissie has no personal liability for any of MEECO's claims.

**Conclusions Regarding MEECO's Trade Secret Claim**

3. The only trade secret misappropriation claim remaining in this action is MEECO's claim for misappropriation of secrets regarding the composition of its creosote destroying firelog.

4. A claim of trade secret misappropriation requires proof by a preponderance of the evidence of "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or

"[d]isclosure or use of a trade secret of another without express or implied consent." RCW § 19.108.010(2).

5. Whatever trade secrets MEECO might have had, Mr. Schaefer admits he voluntarily disclosed them to Imperial representatives in the course of their business relationship. Thus, in order to prove trade secret misappropriation, MEECO would have to prove that Imperial disclosed or used trade secrets relating to the composition of MEECO's creosote destroying firelog.

6. The court concludes that MEECO has not met its burden to show that Imperial disclosed or used trade secrets relating to the composition of its creosote destroying log.

7. The court's conclusion that Imperial did not misappropriate any alleged trade secret makes it unnecessary for the court to decide whether MEECO had any protectable trade secrets in the composition of its creosote destroying firelog.

8. The court's conclusion that Imperial did not misappropriate any alleged trade secret is dispositive of MEECO's claim that the alleged misappropriation also violated the confidentiality agreement between MEECO and Imperial.

**<u>Conclusions Regarding Imperial's Bad Faith Trade Secret Assertion Counterclaim</u>**

9. The court concludes that Imperial has not proven that Imperial asserted any trade secret claim in bad faith under RCW § 19.108.040.

**<u>Conclusions Regarding MEECO's Trade Dress Claims</u>**

10. A claim of trade dress infringement requires proof that the trade dress is protectable either because it is inherently distinctive or because it has acquired secondary meaning among consumers. Although a trade dress claim ordinarily requires the plaintiff to prove that its trade dress is non-functional, the parties'

exclusive focus on their product labels as the embodiment of their trade dress eliminates the need to address the functionality of their trade dress.

11. If a plaintiff's trade dress is protectable, a plaintiff must prove that a defendant's use of a similar trade dress is likely to confuse consumers as to the source of defendant's product.

12. The most distinctive element of both parties' trade dress is the prominent use of the parties' respective names and trademarks. Other distinctive elements, including the background color of the product labels and the use of red bands across the top and bottom of the labels, are much less distinctive than the use of the parties' names and logos.

13. The court reaffirms its conclusion on summary judgment that there is no likelihood of confusion between a MEECO product with an all-white background label and a corresponding Imperial product with an all-yellow background label. The evidence presented at trial reinforces that conclusion.

14. The court concludes that there is no likelihood of confusion between a MEECO product on an all-yellow background label and a corresponding Imperial product with an all-yellow background label. The prominent use of the parties' respective names and trademarks on the product labels is sufficient to immediately dispel any confusion as to the true source of the products.

15. The court reaffirms its June 23, 2005 oral conclusion of law that MEECO's effort to claim ownership of the trade dress in Imperial's private labels is insufficient to show trade dress infringement. Assuming that the court were willing to extend the presumption regarding trademark ownership from Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217 (9th Cir. 1996), to trade dress, MEECO's ownership of the trade dress in the Imperial private label would make no difference. A

consumer comparing a product with an Imperial private label to a product with Imperial's next-generation label could only come to one conclusion, that the next-generation product came from Imperial. There is, therefore, no likelihood of confusion as to the source of the allegedly infringing product.

16. The court's conclusion that there is no likelihood of confusion between the trade dresses at issue here renders it unnecessary to decide whether MEECO's trade dress is protectable either because it has acquired secondary meaning or because it is inherently distinctive.

17. The court concludes that Imperial has not proven that it was a "joint author" of the trade dress in the Imperial private labels.

**Conclusions Regarding MEECO's Trademark Infringement Claim**

18. When Imperial overlabeled its remaining MEECO inventory with Imperial private labels, it engaged in "reverse passing off," a form of trademark infringement. Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc., 7 F.3d 1434, 1437 (9th Cir. 1993).

19. The court concludes that Imperial had no license, express or implied, to engage in this reverse passing off. The parties' course of conduct, including MEECO's practice of specifically approving each customer for whom Imperial could relabel MEECO's products, demonstrates that any license Imperial had did not extend to product sales to True Value.

20. Imperial's reverse passing off damaged MEECO, and the court will award MEECO damages in an amount to be determined.

21. The court concludes that although MEECO improperly asserted in Mr. Schaefer's May 2003 cease and desist letter that trademark law gave it the right to demand

that Imperial stop selling MEECO trademarked products, the improper conduct does not constitute trademark misuse.

22. As to MEECO's trademark claims addressing the "Super Sweep" trademark, the court takes judicial notice on its own motion of the opposition proceeding between the parties pending before the United States Trademark Trial and Appeal Board ("TTAB"), Proceeding No. 91161846. The TTAB has stayed that proceeding, at MEECO's request, pending the outcome of this action.

23. Neither MEECO nor Imperial has successfully registered the "SuperSweep" or "Super Sweep" trademark.

24. As the party asserting infringement of an unregistered trademark, MEECO bears the burden of proving that it has a valid, protectable trademark. Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc., 198 F.3d 1143, 1146 (9th Cir. 1999). MEECO's burden includes the burden of proving that it made the first use in commerce of its asserted trademark. Emergency One, Inc. v. Am. Fire Eagle Engine Co., 332 F.3d 264, 269 (4th Cir. 2003); see also Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 433-34 (7th Cir. 1998) (citing New West Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194 (9th Cir. 1979), regarding the burden of proving priority of use).

25. The court concludes that whatever trademark rights MEECO might have in the "Super Sweep" name, MEECO has not met its burden to prove that those rights extend to the sale of a creosote destroying firelog under that name. The court notes that MEECO had no direct evidence of the extent of Imperial's United States sales of "SuperSweep" chimney brushes, and that it offered only limited evidence about the territorial reach of its own sales of "Super Sweep" firelogs. The court credits Mr. Hayes' testimony that Imperial had sold chimney brushes to customers

across the United States under the SuperSweep name from a time predating MEECO's use of the name. The court concludes that these sales give Imperial priority of use as to the SuperSweep name, and that the use of the SuperSweep name on chemical chimney cleaners like the creosote destroying firelog was a "natural expansion" from the use of the name on mechanical chimney cleaners (i.e., brushes). The court concludes that part of the reason MEECO chose the "Super Sweep" trademark for its creosote destroying firelog was to capitalize on goodwill associated with Imperial's "SuperSweep" trademark.

26. The court's previous conclusions render it unnecessary to further consider MEECO's claims of infringement relating to the "Super Sweep" trademark.

27. The court notes that the evidence supporting each party's contentions regarding the "Super Sweep" or "SuperSweep" trademarks was very thin. Nonetheless, MEECO specifically insisted on presenting its claim at trial over Imperial's objections that the parties had done little discovery to address the claim and that the TTAB should decide the scope of the parties' trademark rights.

28. The court reaffirms its June 23, 2005 oral conclusion of law that MEECO has no claim for trademark infringement arising from any use on the True Value and Lowe's website of pictures of MEECO products in conjunction with product descriptions and pricing information for Imperial products. MEECO has not presented evidence sufficient for the court to determine that Imperial was responsible for the content of these websites, or that Imperial was even aware of the improper use of MEECO product pictures.

**Conclusions Regarding MEECO's Copyright Infringement Claims**

29. A claim of copyright infringement requires that a plaintiff show that it has copyrightable subject matter and that defendant infringed that copyright. Subject

matter is copyrightable if it demonstrates the minimal originality requirement set forth in Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). A defendant infringes a copyright when he copies or distributes matter that is "substantially similar" to the copyrighted subject matter without the copyright holder's permission.

30. MEECO cannot claim the statutory presumption of originality from the Copyright Act because Mr. Schaefer published the copyrighted texts more than five years before MEECO applied for copyright protection. 17 U.S.C. § 410(c).

31. The court concludes that with the exception of the label on its Creo-Shot Chimney Cleaner product (which Mr. Schaefer copied from a competitor's product), MEECO's label texts are original. The label texts demonstrate sufficient creativity to pass the low bar for originality under the Copyright Act.

32. The court concludes that the fact that Mr. Schaefer derived the label texts from previous MEECO labels does not undermine the originality of the texts. As Mr. Schaefer purchased MEECO in 1987, the court assumes in the absence of contrary evidence that he acquired any common law copyright that MEECO held in those labels.

33. The court concludes that Imperial has not proven that it was a "joint author" of any label text in the Imperial private labels or its next-generation labels.

34. Imperial infringed MEECO's copyrighted label texts beginning in 2003 when it sold MEECO product overlabeled with the Imperial private label to True Value. The infringement continued when Imperial incorporated the same text into its next-generation labels. Imperial apparently intends to continue infringing MEECO's copyrighted label texts until September 2005, when it introduces redesigned labels.

35. MEECO does not seek statutory damages for copyright infringement, nor could it, as Imperial's infringement commenced before MEECO had registered any of its copyrights. 17 U.S.C. § 412.

36. MEECO can recover its actual damages arising from Imperial's copyright infringement as well as Imperial's profits from the infringement. 17 U.S.C. § 504.

37. Whether a plaintiff makes a claim for direct profits from infringement (profits made from selling an infringing work) or a claim for indirect profits from infringement (profits made from selling a work that is advertised or promoted using an infringing work), a plaintiff bears the burden of showing that sales of the other product are due in part to the copyright infringement. Mackie v. Rieser, 296 F.3d 909, 914 (9th Cir. 2002) (defining direct and indirect profits); Polar Bear Prods. v. Timex Corp., 384 F.3d 700, 710 n.11 (9th Cir. 2004) (noting the requirement of causation evidence for both direct and indirect profits cases). A plaintiff must meet a threshold burden of demonstrating that the infringement affected an infringer's profits before recovering any profits as damages. Mackie, 296 F.3d at 915.

38. MEECO's argument that Imperial sold its copyrighted texts directly because they were used on Imperial product labels is unavailing. As MEECO's counsel admitted in his closing argument, Imperial's label texts (like all label texts) amount to "a form of short advertising copy." Thus the court will treat Imperial's use of MEECO's texts no differently than other cases where advertisers use copyrighted material to sell their products.

39. The court concludes that MEECO has not presented sufficient evidence for the court to conclude that any portion of Imperial's product sales are due to its

copyright infringement. Thus the court will not award any portion of Imperial's revenues or profits as damages.

40. "Actual damages" under the Copyright Act include the copyright holder's losses as a result of the infringement. Polar Bear Prods., 384 F.3d at 708. "Actual damages are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." Id. (quoting McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 566 (7th Cir. 2003)); see generally Davis v. Gap, Inc., 246 F.3d 152, 161 (2d Cir. 2001) (describing "reasonable license fee" as a measure of actual damages).

41. The court concludes that Imperial's use of MEECO's copyrighted texts had value to Imperial. Imperial's infringement permitted it to avoid the expense and delay of authoring its own label texts. The court will award damages in the form of a reasonable fee for the use of MEECO's label texts, based on objective evidence from the trial record, in an amount to be determined.

## IV. ORDER

Based on the foregoing findings of fact and conclusions of law, the court orders as follows:

1. Imperial is entitled to damages for Imperial's reverse passing off of MEECO products as its own and for Imperial's infringement of MEECO's copyrights.

2. The parties shall submit supplemental briefing to address the proper amount of damages. Each party shall submit a supplemental brief of no more than 10 pages by July 22, 2005. Each party shall respond to the other's supplemental brief no later than July 29, 2005. The court will not consider reply briefs. The parties shall use the supplemental briefs solely to address the two components of damages

listed above. The parties shall not use the supplemental briefs to contest the court's findings and conclusions. The parties shall base their damage contentions solely on the trial record. If a transcript of the record is unavailable, the parties shall indicate by witness name or exhibit number the basis of any assertions relevant to their damage claims.

3. At its option, MEECO may file a brief in support of its request for injunctive relief preventing Imperial's ongoing infringement of its copyrights. MEECO shall file the brief no later than July 22, 2005.

Dated this 7th day of July, 2005.

JAMES L. ROBART
United States District Judge